Douglas Stein is here for Marrache, Alex Andaman is here for the Amicus, and Martin Steinberg is here for Bacardi and Winn-Dixie. Mr. Stein, are you ready to proceed with your argument? I am, Judge. Mr. Steinberg? Thank you. May it please the Court, Doug Stein for the appellant Uri Marrache. The issue in this case is whether Florida Statute 562.455, which has been on the books of the Florida statutes for more than 152 years and which prohibits liquor containing an ingredient known as grains of paradise from being sold within the state of Florida, is preempted by federal regulations and acted under the Federal Food, Drug, and Cosmetic Act, the FDCA, and the Food Additives Amendment, the FAA, which place grains of paradise on a list as being safe to consume. The district court applied the principle of conflict preemption, which can occur when a state law is an obstacle to the objective of a federal law to rule that section 562.455 is preempted. That ruling is erroneous for multiple reasons. First, your honors, there is no conflict between 562.455 and any federal statute. This court has consistently held that it's presumed Congress does not intend to supersede laws of a state unless it is the clear and manifest purpose of Congress to do so. And that purpose is determined from the language of the federal statute and the statutory framework surrounding it. 562.455 is not an obstacle to the objective of the FDCA or the FAA. This is Judge Lagoa, good morning, how are you? I'm just fine, Judge. Good to see you. I have a question for you. Let's assume that I agree with you that the issue is not preempted and that the district court got it wrong. Can we discuss the actual merits of the lawsuit because the district court also ruled on damages that your client did not meet actual damages under FDUCTA. Can you address that issue for me? Yes, Judge. Well, first of all, specifically what the district court ruled was that we weren't able to sufficiently plead a cause of action because of the element that you must plead actual damages. And so in this case, under FDUCTA, decisions from this court and of course from the Supreme Court from other cases and other courts, in fact, in this case, in the Debernardis case, which was relied on by the district court, this court held that you must plead and prove actual damages that when it is the product is illegal to be sold in the state that the product is either therefore worthless or has a diminished value. And that could satisfy a pleading the element of actual damages and a cause of action for FDUCTA. However, in this case, the district judge ruled that it was not sufficient because it's not illegal to sell this food product in the state because reverting back to his original ruling that the that the statute is preempted. Well, this is what I'm sorry. I'm sorry, Judge Brasher. Go ahead. Well, let me ask you a question, though. But under the under the law in Florida for FDUCTA, you do have to show actual damages and there isn't theoretically you could still sell the Bombay gin to, you know, you could cross state lines and go to Georgia or Alabama and sell them there because grains of paradise are not illegal there. But I guess my my other question is, under FDUCTA, the Florida FDUCTA statute, there's a safe harbor provision that says that if you if something is allowed under federal law, then FDUCTA does not apply. So can you address that issue for me? Absolutely, Judge. So, again, that reverts back to the district court's ruling on preemption. It doesn't really, though, I don't know that that I don't know that that answers Judge Lagoa's question, because the statute, the Florida statute says that it doesn't apply to any act or practice required or specifically permitted by federal or state law, which seems to be different than the question of whether federal or federal law preempts a state law. Well, Judge, there's no law or the laws that are that are at issue here, the the FDA regulations, they don't specifically permit the sale of these products. What they do are and are amicus brief will be amicus will address this more in depth. But what they do is place them on a list which says that they're safe to consume. So they don't address whether it's permissible to sale or whether it's prohibited from sale. All they say is that they're safe to consume. And so there is no federal statute at issue in this case, which permits the sale of this doesn't allow. Isn't there a regulation that says that grains of whatever it's called paradise are allowed to be a food additive in alcohol? Isn't that the regulation? Well, what it says is that grains of paradise are safe to consume. And I assume you're talking about the FDA regulations. Yes, yes. So what the FDA regulations say, they're on a list that placed on the FDA, which says that this is a product that's safe to consume. It has nothing to do as to whether it's permitted to be sold or prohibited from being sold. And that's really the regulation use the word permit, though, it says the purpose is to will advance food technology by permitting the use of food additives at safe levels. Can I ask what you're quoting from your honor? Well, isn't that in the in the food additives amendment to the Federal Food, Drug and Cosmetic Act? Well, Judge, I think I think those words, I'm not sure those words are actually in the statute itself. I think what the what the appellees have argued and what the district court found was that that was part of the legislative history of the of the enactment of those of those statutes. But number one, the legislative history is just those were the opinions of a few legislators, which in fact were were in conflict with the opinions of other legislators as to what the actual purpose is. This court, your honor, being the author of a few decisions on preemption involving the that that there is no conflict or requirement that the manifest purpose of that statute is for public health and safety, not to allow products into the market, but to prohibit unsafe products from entering the market. So and indeed, there is no federal law, federal statute, federal case that's that states that any particular food products are must be placed into the market. Of course. Of course. I think you're right about that. And I think you can assume that I agree with you on federal preemption for the purposes of this question. But I want to go back to this statement that is specifically in Florida statute. And my concern with reading it the way that you're suggesting we read it is it basically makes it irrelevant because I think the way you would have us read it is to say the question is whether federal law preempts something. And if that's the only thing that this statement in Florida's law does, then it's just irrelevant because if federal law preempts Florida's Deceptive Practices Act, then of course it doesn't apply. But it seems like Florida was trying to get to something more than an irrelevancy when it added this clause in there. What do you say about my concern that you're reading of it to be coextensive with preemption would just make it irrelevant? Well, I understand what you're saying, Judge. But I think that there, when we're talking preemption, we're talking a blanket issue and that if something's preempted, it's preempted. But I think you have to look on a case-by-case basis as to whether a federal statute permits something. But Mr. Stein, isn't the whole point of this particular provision, the 501.212, which is the safe harbor provision, which is what it, that's why it's called the safe harbor provision, it is basically allowing, there's not a preemption issue in terms of federal preemption, but we're going to allow you to be excluded from a FDUPTA claim if a federal law permits a particular act or practice. So in this particular situation, a federal regulation permits the use of grains of paradise in alcohol to be an additive into alcohol. So isn't that, in essence, a safe harbor? Doesn't McCarty now have a safe harbor in Florida for that purpose? But with all due respect, Judge, I have to disagree with your preface, and that is, that federal statute- It wouldn't be the first time, Mr. Stein. Yes, I know that. It does not permit the use of grains of paradise in liquor. All it states is that grains of paradise is safe, and there may be a thousand other regulations out there, or state regulations, which say that under particular circumstances, grains of paradise may not be, may not be used. And that, of course, that has nothing to do with whether it's a safe product or not a safe product. We cite- May I ask you another question as your time is almost up? Are you traveling under, for purposes of FDUPTA, under an unfair practice or a deceptive practice or both? Both. Okay, both. Both are alleged in the complaint. How can you then allege a deceptive practice when the bottle of Bombay gin specifically has, and your complaint says it, so even traveling under a motion to dismiss, it says that the bottle has ingrained on it, or engraved on it, the fact that the bottle has grains of paradise. So how is it deceptive? It's a deceptive practice, Your Honor, because a typical layperson who's purchasing that product does not know that it's illegal to sell that product. And yet they advertise it as being a product that can be sold in the state of Florida without disclosing that it cannot. That is a deceptive practice, Your Honor. But that's not alleged in the complaint? Your Honor, I think that the general allegations in the complaint encompass that, and I would state that the district court specifically ruled that Mr. Maracci was capable of stating a cause of action, but he wasn't going to allow an amendment to the complaint because he found preemption made a futile. Let me ask you one last question. For purposes of unjust enrichment, what is a direct benefit to Bacardi because the allegations in the complaint are that the bottles were purchased at McDixie and they were not purchased from Bacardi? Bacardi, of course, sells the product to Winn-Dixie. Winn-Dixie sells it to the customer every time. Is the case law in Florida that for unjust enrichment you have to have a direct contact? I don't know about direct contact, Your Honor, but direct benefit. And I think it is a direct benefit that every time a customer buys a product produced by Bacardi, Bacardi benefits thereby. So I think clearly that we satisfy the pleading requirements of unjust enrichment. I think my time is completely up, so I would ask that the order of dismissal and judgment be reversed. Sir, Stein, is Winn-Dixie the only supermarket in Florida that sells Bacardi's Bombay Sapphire Gin? There's nothing in the record about that, Judge, but I have to imagine that the answer is no and that there is a potential for more litigation, I guess. But there's nothing in the record in that regard, Judge. Okay. Thank you. Ms. Andaman, you have some time for argument. Thank you. Good morning, and may it please the court, I'm Alexis Andaman for Amici Curie. Amici urged this court to reverse the district court's finding that the Food, Drug, and Cosmetic Act and FDA's implementing regulation preempt Florida's law prohibiting the use of grains of paradise and alcohol. More than 150 years ago, Florida enacted that law to protect public health. Whether the law continues to provide public health protection is a question for the Florida legislature, but there is no question that Florida and every other state possesses the authority to protect public health by enacting laws and regulations that are stricter than I'd like to touch upon three key points. First, Florida's law is not preempted by the Food, Drug, and Cosmetic Act or FDA's implementing regulations, and in particular, it does not frustrate the purpose of those federal acts, so there's no conflict preemption. Second, Florida's law is not an outlier. Many states have enacted laws stricter than federal standards governing food. And third, if this court affirms the district court's preemption finding, which it should not, it must make clear that its ruling does not extend to manufacturers' secret safety determinations. First, of the various forms of potential preemption, only one is remotely possible here, and Florida's law is not conflict preempted. To the contrary, it is entirely consistent with the purposes of both the Food, Drug, and Additives Amendment of 1958, which Congress enacted to protect public health by prohibiting the use of unsafe food additives. Defined otherwise, the district court ignored the plain text of the amendment and instead misread its legislative history to create a secondary goal focused on national uniformity that simply does not exist. There is no conflicting goal, and thus, there's no conflict preemption. And I'd also note, as this court recognized in Branch v. Airtrain Airways, there's an inference that an express preemption clause forecloses implied preemption. Here, the Food, Drug, and Cosmetic Act does include a number of express preemption clauses, but none of them apply to state food safety laws. Second, Florida's law is not unusual. Many states have exercised their authority to protect public health by enacting laws and The Supreme Court recognized that states have the authority to do that in Florida Lime and Avocado Growers v. Paul. And in fact, states can impose additional restrictions on a range of products regulated and deemed safe by the federal government, including drugs and pesticides. That authority is profoundly important in protecting public health for at least two reasons. First, the federal government can be slow in responding to emerging public health crises. So, for example, Washington State banned caffeinated alcoholic beverages after those drinks were linked to multiple deaths, but before FDA took any action. And FDA continues to consider most uses of caffeine to be generally recognized as safe for grass. Second, in some instances, states reasonably conclude that the federal government hasn't gone far enough to protect public health. So, for example, New York State has imposed a ban on the use of certain preservatives that can cause deadly allergic reactions. That's far stricter than FDA's regulations, which consider most uses of those preservatives to be grass. And these state laws illustrate the importance of the strong presumption against preemption and the far-reaching, potentially really destructive effect of affirming the district court's preemption finding in this case. Finally, even if the Food, Drug, and Cosmetic Act could preempt stricter state laws for ensuring food safety in some circumstances, which it cannot, preemption is especially inappropriate here in the context of a grass regulation. And that's because FDA's grass program is plagued with problems and it fails to protect public health for at least two key reasons. First, FDA fails to oversee new grass determinations. Because grass substances must be safe by definition, Congress didn't require them to undergo rigorous premarket safety review. But for at least 25 years, FDA has allowed manufacturers to self-certify chemical substances as grass in secret without any notice to FDA or the public. As a result, experts estimate that approximately 3,000 chemical substances have been self-certified as grass by manufacturers. And FDA admits that it cannot vouch for the safety of grass substances. Second, FDA fails to revisit past grass determinations in light of emerging scientific evidence and new information about safety, meaning that FDA can't take prompt action to prevent manufacturers from continuing to use substances that are now known to be unsafe. I see my time is up. If I can briefly conclude. You may. Amici respectfully asked this court to reverse the district court's ruling on preemption because that court misread the Food Additive Amendment's legislative history to create a secondary goal that does not exist. And in so doing, it threatened a range of state food safety laws that have a profound impact on public health. All right. Thank you, counsel. And we'll hear from Mr. Steinberg on behalf of Bacardi and Winn-Dixie. You're muted, Mr. Steinberg. Muted. You're still muted. Mr. Steinberg, you're still muted. There we go. Can you hear me now? Yes, we can. I'm sorry. I apologize for that. May it please the court. Marty Steinberg from Bacardi and Winn-Dixie. The appellants want to hold the appellees liable simply because a 150-year-old state criminal statute contains grains of paradise in it. Not because it's an adulterant, but merely because it's listed in the statute. Now, Judge Gola stated that the plaintiff's claims are preempted by the FDCA. And he also held that the plaintiff's claims could not meet the elements of FDUCTA. And to answer Judge Lagoa's question, this court can affirm for any reason in the record whether or not the district court reached that conclusion. But underlying all of the judge's decisions were the issue of adulteration, which is the key issue in this case. First, it's important to note that the appellant doesn't claim that grains of paradise adulterates liquor. He doesn't claim that it creates any harm in liquor. He drank the liquor and suffered no harm. And he withdrew his claim of being misled under FDUCTA, contrary to what he just said. In his response to the motion to dismiss at page 7, the appellant says, plaintiff does not allege nor can it that defendants are acting deceptively under the statute. So he acknowledges that grains of paradise is etched on the side of the bottle of Bombay Sapphire Gin. He also acknowledges he's on notice of the criminal statute. So what is the adulteration that is contained in the statute as interpreted by the appellant here? Now, the statute reads, and I'll read in pertinent part, not all the words, whoever, quote, adulterates any liquor with, and then there's a list of items including grains of paradise. And then it says, or any other substance that is poisonous or injurious to health. And it concludes by saying, whoever sells any liquor so adulterated shall be guilty of a felony by the third degree. Clearly, listing grains of paradise in a list does not make it an adulterant unless you read out the words. Is it your position that Bacardi doesn't use grains of paradise? Is that what you're saying? That there's no grains of paradise in the liquor? No, no. There is grains of paradise in the liquor, and it's etched on the bottle. So everyone knows that. I guess I just don't understand. And frankly, I don't understand why you do this in your brief either, because it seems like by far your weakest argument. But you're not being prosecuted for violating the statute. So the question isn't whether Bacardi should be prosecuted for a felony. The question is whether you can be sued under what everybody is calling feducta, which I assume is what people in Florida call this statute. Why does it even matter whether you could be prosecuted for adulterating under this statute? I agree with you, Judge. But this statute has no private cause of action, and it is not a predicate statute under feducta. It doesn't qualify as either. The plaintiff is merely referring to the statute as automatically creating liability simply because grains of paradise is in a product. And unless you read the words of the statute out, you can't come to that conclusion. In fact, the United States Supreme Court said in U.S. v. Lexington Mills that even where a gradient is harmful, unless it causes an injurious consequence, it can't be considered an adulterant. And here Florida interpreted the word adulterated. Long after this old statute was enacted, Florida itself adopted the federal definition of adulterated in the Florida Food Safety Act. And Florida stated that to be adulterated under Section 500.10, food and drinks can only be adulterated if they bear a poisonous or if it's deleterious to health or contains any food additive which is unsafe within the meaning of the U.S. code. Well, Black's Law Dictionary defines adulterate as, quote, to debase or make impure by adding a foreign or inferior substance, end quote. Why would we use a very specific definition that appears in another statute unrelated to this one instead of just using the general term adulterate, which doesn't seem to have anything to do with injurious nature? The only definition of adulterating a food or substance are contained in the Federal Food and Drug Act or the Florida Food Safety Act. Were any of those in existence when this law was passed shortly after the Civil War? No, that's the point. So why would we think that the Reconstruction Legislature in Florida adopted very idiosyncratic terms that were, I mean, as defined in later federal regulations and later laws? Why would they do that? Well, many times with ancient statutes, when a state looks at the issue based on scientific analysis, it determines that this definition must apply to the word adulterated, which effectively repeals the portion of the statute before it that had any different conclusion, that is, something is automatically an adulterant just because you list it. So they don't, and by the way, Judge, it's important to note, they don't allege any injury. They allege they drank the Bombay gin and they weren't injured. So the only case they cited for this position, that you can have an item in a food that doesn't adulterate it, is the Evans packing case. And in that case, the court held that pulp wash added to orange juice was an additive, even though it technically didn't render it unfit. However, in the complaint, do they not specifically allege that an adulterated liquor is the liquor defined in Florida statute 5 65 0 1? They themselves use that definition of adultery. Well, they do allege that the product is adulterated only as a result of that statute. They don't allege any facts of adulteration. Adulteration means you change a product that make it injurious to health or unsafe. Why does it mean that though, when the dictionary definition doesn't include that? I guess that's what I'm having a difficult time figuring out. When you say it means that you're not citing to a dictionary, you're citing to other statutes where that's a defined term. Well, because the Florida statute is the statute that governs adulterated food or alcohol in Florida, there is no other statute. And we don't believe you should rely on the dictionary in such a case. And more importantly, so you believe the correct mode of statutory interpretation is to find the definition of a term and some other statute in the same state. And then just say that that's what we're going to use throughout the entire code. Whenever that term is used, that's the way we're supposed to do this.  when the state speaks to that exact subject matter, yes, in fact, the state of Florida, as you know, adopted the grass list. They adopted the federal regulations that being grains of paradise and other seasonings would be safe for use in food and drinks. So when the state addresses the issue in a later law, they effectively repealed the prior law that didn't address that issue because adulteration is not defined in the criminal statute. And importantly, their whole premise relies on grains of paradise being a quote additive. Grains of paradise has been decided by the federal government not to be an additive because Florida and federal law excludes ingredients that are generally recognized as safe grass as additives because they don't change the nature of the food. They may flavor it. They may create a smell, but they don't change the nature of the food to be unsafe. And Florida agrees. In 1963, Florida adopted the exact same exempted substances that the federal government, including grains of paradise. And not only did they do that, but they incorporated it into their federal regulation in Florida in the Florida administrative code. So it's important to note that by exempting grains of paradise from being an additive and agreeing it was safe to use as an ingredient, both the federal law and Florida law agree. In fact, I think it's important to know what plaintiff admitted here. Plaintiff in their initial brief said the following, once a food additive is determined to be grass, quote, there is no longer an issue whether it's safe for consumption. That's a page 21. And then the appellant said, quote, likewise, the FAA prohibit unsafe food additives from entering the market and contains a list which designates those food additives, which have been found to be grass. And therefore are not banned from entering the market. So what do we have here? Plaintiff admitted that grains of paradise is not an adulterant. It can't be banned from entering the market, but they wouldn't ban it from being in a liquor product in Florida. It just is totally inconsistent with their position. And as judge Lagoa says, obviously we meet the standards of the safe Harbor provision under FIDUCTA. And that says anything specifically permitted by federal or state law here, grains of paradise is permitted by both federal and state law to be a safe ingredient added to foods and drinks. I mean, there is no other grass list. There is no state craft list. The federal government put a great deal of effort into creating this list so that people would know companies and people would know what is safe to add to an ingredient, to a product. And Florida has adopted it. Now, for example, we cited pie versus fifth generation. And in that case, the plaintiffs brought up the dump to claim against keto vodka, claiming that they purchased the vodka relying on some misleading statements. We don't even have that here, but nevertheless, the court ruled in that case that because the TTV permitted that kind of labeling, it meant the safe Harbor provisions of Florida law. Bombay gin has the same TTP approval. We cited footnote 10 in our brief. And in addition to that grains of paradise is approved by the state and the federal government. Therefore the only act identified in appellant suit, and that's the inclusion of grains of paradise in Bob, a gin is specifically permitted by both federal and state law. And by the way, there's no inconsistency with being both preempted and separately barred by the safe Harbor. We cited the, oh, he is versus AstraZeneca case. And in that case where the third BC affirmed a dismissal because he held the contact, the conduct alleged by the plaintiff fell within the safe Harbor, because it was permitted by the federal government. And the claims are also preempted for the same reason because it conflicted with the regulatory scheme. Now they say we can't, you can't dismiss them safe Harbor, but we've cited a bunch of cases that at the dismissal stage you can, you can dismiss. Also they haven't met any of the elements of the Delta, which are accepted and unfair practice causation, damages resulting from a deceptive act. So for deception, you have to mislead someone here. It was etched in the bottle. We didn't mislead anyone. And also in their complaint, they admit they knew it was on the bottom. And they bought it anyway. They consumed it. They weren't injured. And you could always on that point, on that point, on that point, that one specific point, could you talk about Debra Nardis a little bit? Because I think that is what the plaintiff is relying on mostly to suggest that their injury is sufficient to state a claim. I'd be glad to your honor. Apparently they're relying on the, the narrow exception that were created for a product that contains a defect of the nature to make that product worthless. Now in Debra Nardis, as you know, better than I, that case dealt with a product that contained a substance that had already been banned by Congress as illegal. And so that case came to the narrow conclusion that when you have a product that was banned by Congress as being illegal, it couldn't be sold. But the court went on, as you know, to say, look, this is a narrow exception under some other regulatory scheme, a plaintiff claims that they're injured by a item in a, in a, in a product. We, we may not come to the same conclusion. And that's the scheme we're talking about here. I have a question for Steinberg and Debra Nardis. Was it also one of the reasons given by the court was that the product was quote unquote worthless because it was banned. So it couldn't be sold. Correct. But only. But here, but here Bombay, even if brains of paradise is illegal in Florida, you could still sell it in the other States. It's not worth it. Yes, you can, your honor. And following up with that, it was only banned because there was a prior congressional decision that a substance in the product was illegal to sell here. You have the opposite. You have the federal and state government both saying brains of paradise is a safe ingredient. So it doesn't meet that narrow exception and it doesn't meet the definition of a defect. Remember under any definition, a defect has to be something in a product that causes it to be injurious to others. They don't allege that and grains of paradise has been found safe and so forth. And they, they withdrew their claim of deception by stating in a pleading quote, plaintiff does not allege nor can it that defendants are acting deceptively. That's a page seven in their response to the motion to dismiss. They can't rely on unfairness because as the third DCA ruled in Porsche cars, you have to have both a substantial injury that a party could not have avoided. And here, of course, they could have easily avoided it just like Porsche by not buying the product because they already knew it contained brains of paradise. And obviously they haven't alleged damages because there's no deception on fairness. Damages can't flow from that. I'd like to turn the damage. The damage that they're alleging is that the product is worthless and I'm not getting, I'm not getting my money's worth. Correct. Buying a product that Florida law says contains an adulterant. I'm still having a hard time figuring out why that could not be sufficient to support a claim for damage. Sure. Well, first of all, brains of paradise has been found not to be an adulterant by the state and federal government. So this statute would be in direct conflict. If you interpret the statute as automatically creating, it's not, but it's an adulterant when it's added to liquor. That's what we're dealing with. Well, I mean, that's an interesting issue. It doesn't, it doesn't, it doesn't cover wine or beer. It doesn't cover ginger ale. It doesn't cover milk. Why is grains of paradise added to liquor and adulterant? It doesn't, it's sold on shelves in grocery stores in Florida. It doesn't make any sense. It's 150 year old statute. So, you know, but in terms of the issue of adulteration, it also is important for preemption because the federal government was granted by Congress, the right control the introduction of food additives into interstate commerce. That means among all the states. And the food additives amendment was enacted to provide not only consumer, but manufacturers and retailers with assurances about safety of consumers to protect the public from harm. And second to allow the public to use safe ingredients. And those are the two goals of the act that are set forth in the statute in the congressional history. And it's also on the face of the statute where it says spices and other natural, natural seasonings and flavors are generally recognized as safe for their use. And so therefore to automatically say, let's think about your preemption argument. I want to think about your preemption argument just for a second. It seems more like a field preemption argument than a conflict preemption. It seems like you're just suggesting that Congress regulated the entire field, decided what was safe, decided what was not safe. And therefore states can't do differently than that. Didn't the Supreme court say the opposite of that in the case about this statute, which I can't recall the name of? Your honor. We believe it's certainly a conflict preemption because where the federal and state. How is it ever a conflict for the federal government to not ban something, but for a state to decide to ban something? How was that ever a conflict? Well, your honor, we cited the PHO cases, partially hydrogenized whatever. And in all of those cases for the PHO, they were considered grass items generally regarded as being safe. These are federal courts. All of the cases, the court preempted a claim where a state statute or a state claim that these were not safe. And we cited Beasley versus Conagra brands. And the grass scheme was utilized there as the basis for preemption. We cited Bacchus versus physical America, where a plaintiff interpreted like they are here. They interpreted the state law as banning PHOs, the state California food, drug, and cosmetic act. And the court and the federal court looked at that. They said, no, to interpret a state law as prohibiting something that's on the grass list is in direct conflict with the federal regulatory scheme and it must be preempted. So your honor, I believe for all those reasons both that they can't meet any of the elements of the state claims and they're in direct conflict with the federal regulatory scheme. The court should uphold the lower court. Thank you. All right. Thank you. Mr. Steinberg. And Mr. Stein, you've reserved some time for rebuttal. You're muted. Mr. Stein. Thank you, judge. So let me start with that last point on the cases, the Beasley cases regarding PHOs because it ties right in with the rest of this argument. The state action that was filed in those California cases was for a determination that PHOs were unsafe and the federal government had determined that they are safe. So that clearly was preempted. Our action here is not founded on any allegation that grains of paradise is unsafe and it's totally unnecessary for us to prove that it is unsafe. All we need to prove is that it's illegal to sell in the state of Florida. But Mr. Stein, we're here under a FIDUCTA claim, right? And I'm just in Richmond and the elements for FIDUCTA are not, are not that. So tell me how exactly you meet the elements of FIDUCTA. Judge, as, as we stayed, stayed in the brief, I think that all of the elements and we go through this piece by piece. The three elements are, uh, you have to show a deceptive act or an unfair practice causation and actual damages. Okay. Correct. Deception. I don't, I don't know how you can meet that when it's on the bottom, but, uh, so let's talk about unfair practice. I think that here, the deception and the unfair practice are pretty much one in the same. And that is judge, as I stated before, that when a customer goes into the, uh, into the store to buy a product, they don't expect that the product is illegal to be sold. They assume the product is legal to be sold. And the mere fact that it's, so that's the deceptive act slash unfair practice. But then it goes back to the safe harbor provision because under the safe harbor provision of FIDUCTA, if something is permitted under federal law, which in this case, grains of paradise are allowed to be included in alcohol, sold in alcohol, placed in alcohol, then it's permitted. And it's comes out of the seductive again, judge, I'm going to go back and I may sound like a broken clock here, but, uh, the federal statute does not permit the sale of, of liquor that has grains of, of paradise. What it does is place grains of paradise on a safe list and say it's, it's safe to consume. This would be like saying that the, uh, I don't know the names of the statues, but the federal statutes governing automotive safety also don't permit or don't prohibit the sale of grains of paradise in liquor because they don't. But that doesn't mean that is permitted by that federal statute. It's just totally irrelevant. It's a non-sequitur simply because it's deemed safe to sell. Doesn't mean that it must be permitted to be sold. Um, so it does not fall within the safe harbor act. I do want to address, uh, my opponent's basically the, the, the premise of his argument is that in order to be adulterated, uh, a product must, uh, must be unsafe or injurious for human consumption. That's just absolutely not true. Um, even in the, the partial definition of adulterated that he gave in regard to the Florida food safety act, uh, the rest of the definition states that, uh, that adulterated includes food that has merely been reduced in quality. As judge Brasher, as you pointed out, that clearly is the dictionary definition. And let me point out, it's not just the evidence case, which would regarding orange pulp, which specifically said that orange juice was adulterated because it had orange pulp in it. And it specifically stated that, uh, that it was not injurious for human consumption, but we also have the Anderson case again from the Florida Supreme court, which said that milk that had less than two chocolate milk that had less than 2% fat in it was quote adulterated. Even though, again, it specifically found that it was not, uh, uh, injurious to health. So we clearly fit within the definition of adulterated as that, that word is used in the Florida statute, which precludes the sale of this food product. I see that my time is up. And, uh, but unless there's any more questions, I'll be glad to answer. Uh, we would ask that the judgment be reversed. All right. Thank you. Council. And that concludes our docket for this morning. This court will be in recess until nine o'clock tomorrow morning. Thank you. Thank you. Have a good day. Thank you. Thank you.